Fourth case is United States v. Minnick. Mr. Webb. Good to have you, Mr. Webb. Thank you, Your Honor, and may it please the court. My name is Derek Webb. I'm representing Mr. Olden Minnick in this appeal. There are quite a number of issues before the court today in this case, but during our argument today, I want to focus just on two issues. The first being the drug weight that was attributed to Mr. Minnick, both at sentencing of 9.22 kilograms of heroin and then at trial of one kilogram or more at trial. And then the second is the validity of the Shawn Wilson and Fred Brooks wire taps of May and June of 2014. Those two issues, drug weight and the validity of those two initial wire taps in Baltimore court will be the focus of my oral argument, unless there are questions on anything else I'm happy to answer. So with regard to drug weight, beginning with sentencing, after a nine month investigation that involved multiple wire taps, GPS tracking, physical surveillance, poll cams, the government came up with zero evidence, a hard evidence of Mr. Minnick possessing any heroin. They went into both of his houses. They found zero heroin there. They found no residue of heroin there. They found no paraphernalia of heroin. They also had no witnesses, either co-conspirators, law enforcement officers, or any other witnesses who said that they saw Minnick possess heroin, sell heroin or receive heroin in the baggies of heroin that were obtained from other people. Would you call that no hard evidence? I would say that's no hard evidence. Is that what you said? Hard evidence? Direct evidence. They didn't have any hard evidence is what you said. Yes, Your Honor. But they, uh, you know, circumstantial evidence was good. For sure. They do have pretty good stuff. There are a lot of people in penitentiary on circumstantial evidence. Yes, Your Honor. So they do put forward some, some circumstantial evidence. And so when it comes to the, uh, the weight at sentencing, they didn't have any hard evidence. So what they, what the judge relied upon instead was, uh, two numbers that he multiplied together to get the number of 9.22. And I just want to take the court through what that rationale was. There were two numbers. First was 1.25. That was 1.25 kilograms was the base weight. Uh, the judge estimated Mr. Minnick was involved with and multiply that number by seven to get overall to the number, uh, basically to the number 9.22. Now the 1.25 number 1.25 kilograms didn't come from any shipment that Mr. Minnick received from Sean Wilson. Um, what it came from was a text message that Mr. Minnick sent to Mr. Sean Wilson that said 1250 and the government agent during trial, uh, when he was asked, what does 1250 mean? He said it was a drug amount. He didn't specify at that time that that was a heroin. It could very well have been marijuana. And the problem in this case is that Mr. You agree with that. Absolutely. Your Honor. But all the government provided at evidence was that it was a drug amount. And the problem here is that they charged him on the same account and same count with both, uh, heroin and marijuana with the same individual. So the evidence on heroin, there was evidence about that he received two to three kilograms every time. So 1.25 is pretty generous downward, uh, departure. Yes, Your Honor. So it does go down from two to three to 1.25, but that gets to the sort of the issue of sort of where it is two to three come from. And the two to three comes from testimony exclusively from Fred Brooks, uh, who was a government cooperator who said this wasn't not his own sort of firsthand testimony. What he said was that Sean Wilson told me that he gave, um, Minnick to me about the amount of heroin that we can strew and the light most favorable to the government. Right. But what are the recorded conversations that had the references to, um, quantities between four and two? That's right, Your Honor. So, right. So there's a lot of evidence. Well, okay. So if we want to take a look at the two or the four, uh, so first, again, the government agent said, what, what is two or four? He was asked what it's two or four. And he said, it's a drug amount. He didn't specify either that it was heroin or that it was kilograms. Also August 5th, uh, the government put on an expert named Thomas Eveler, who I recommend you to when he looked at some text messages where they were, Minnick was going up with a guy named BLK and they were going back and forth with text messaging saying, do you have the two left or do you have the four left or the two gone for the same example, you know, kind of verbatim thing that you had in that June 5th conversation. And Thomas Eveler said that that is definitely a marijuana conversation, not a heroin conversation. So the mere fact that you have two or four doesn't get you all the way to heroin, much less kilograms worth of heroin. Um, so that's the 1.25 number comes just from a text message, um, that, that the government introduced. The seven comes exclusively from the Fred Brooks testimony again about the frequency. And here there are two issues. One is that it's an out of court statement. Um, so it's presumptively tell me if I'm remembering this wrong, would have led to most point by nine. Right. But the district court said again, to try to be generous, I'm lowering it to 1.2 and I'm going to April was a light month for drugs. So I'm going to lower it to seven. Right. But this is all still sort of more of a, that's true. It came down from, from nine to seven hearsay evidence. Uh, no, we're saying there wasn't miscible. We're saying that it's admissible under the federal rules of evidence. If it's admissible, if it was admitted without objection, the jury can consider it. Jerry can consider it and we have to accept the proposition that they looked at it in the light, most favorable to the government. If they have five or six different estimates, the highest one would be the one that the government's entitled to. Right. So all we're saying here is that it needs some corroboration and the judge himself acknowledged that the Fred Brooks testimony, it, that's all we have on frequency and the government acknowledged that's all we have on frequency and it wasn't corroborated. Well, hold on. They believe him and we returned a guilty verdict. Right. So they believed him. But all Fred Brooks, again, just to remind the court of what Fred Brooks actually said and what he didn't say. All he said was that Sean Wilson told him that he gave him a two to three kilograms at a time. We again, don't know what at a time meant, whether it meant every month, every 10 days, every year. We don't have any testimony to that on that point either. So our point just on the sentencing weight is that what the judge had to do was guess. He said 1.25. Well, it's less than two to three. It's based on this text mentions that says 1250, we'll say 1.25 kilograms, again, without any evidence on that. And with regard to the seven, it was, Your Honor, it's true. It came down. It was more conservative than the eight or nine. But still it was based on sort of one statement that lacked any kind of corroboration. And most importantly, under Hickman, it was not based in one single evidenced transaction. And Hickman has said, if you, if the fact finder has to rely upon any attenuated kind of information, that, that holding, you know, that, that finding of drug weight has to be vacated. With regard to the drug weight at trial, if there was basically, the government relies again upon the Fred Brooks testimony, a number of ambiguous pieces of data points from the Sean Wilson wire tab, the 1250 number, the two or the four conversation, and also the 400, which was integral to the conversation on June 5th about tickets, where there was a government, sorry, where there was a witness for the defense who said that he sold Minick two tickets to a concert, jazz concert for $200 a piece, which would have been 400. But again, so that's what they have on in terms of rather ambiguous and kind of unreliable data points from the Sean Wilson wire tab. They have his wealth. Minick had some money. He had about over the course of two and a half years, about $270,000 was deposited. He had jewelry of about $130,000 the government didn't tie that though directly to heroin. David, Mr. May didn't was involved in marijuana sales. We know that he actually had a pretty good history in sports betting. His sister testified at trial that he had won $200,000 in a lottery back in 2010. Again, the government didn't prove beyond a reasonable doubt that the wealth that he had came clearly and directly from from heroin. There are other bits of data that they use, a communications between Mr. Minick and Sean Wilson, Christian Bird and other people who were found to have been involved in heroin. But again, they charged him on this big, huge count, which was responsible for his, his prison sentence of 14 years. He was involved with them also with marijuana too. So the mere fact of pings and contacts and text messages and visits doesn't again show that he was definitely beyond a reasonable doubt involved in heroin itself and not just marijuana sales. And it's the heroin charge that is totally driving this. One kilogram or more gets you a minimum of 10 years. The government may point to two substantive charges, a charge with Terrence Stanback in September of 2014 and another one with Christian Bird in June. But even spotting the government that those were correct, even though those were obtained from two other individuals and fingerprints were done on the Stanback heroin and Minick's fingerprints were not found on that heroin and the baggies that Stanback had were not found in Minick's house. But even spotting them, those 200 grams, they need the government needs to get to 1000 to one kilogram beyond a reasonable doubt because the difference between 100 grams and 1000 grams is five years of Mr. Minick's life in prison. And they have to kind of show that beyond a reasonable doubt. And Hickman again, it's on point that even though you can show that someone was involved in a narcotics conspiracy that was fairly wide ranging, that still is not enough to show specific drug weight. You have to particularize the findings. There are no objections or arguments about the illegality of any of the court instructions, right? The jury instructions? No. And they're not about the form of the jury verdict? Not about the form of the jury verdict. No, Your Honor, that's correct. Yeah. There was a special verdict that the jury found and they had an opportunity to choose. They selected between zero 100 and 100 grams and one kilogram and one kilogram or more. And they chose one kilogram or more. Hickman also shows that if there's not, if there is some evidence of heroin involvement, but not full evidence of one kilogram, this court can charge on a lesser included offense, which might be just 100 grams of heroin. In the remaining time I wanted to try it unless there are other questions on drug weight, talk a little bit about the Sean Wilson wiretap, which is sort of the font of this entire investigation. It winds up being cited in about 14 other wiretap and GPS tracking orders. And we are raising a number of objections to it, but the two we want to focus on are first the necessity determination, the exhaustion section of the, of the Wilson wiretap, which is pretty much fact free. It's true. There are a myriad of investing of categories that are, that are kind of mentioned. But if you look, if you read each of those sort of sections, they are, it's sort of a textbook example of how to do sort of a kind of boilerplate analysis that's generalized. It could have been used in any drug conspiracy. And then that one, one that was raised before the district court or we hear now on plain error. So that one definitely was raised before the court, the necessity argument and the judge, the district court judge at the suppression hearing made a, made a ruling on that and said, well, no, he, you know, he said, Oh, look, there are a number of different categories and look, here's Wilson. I had multiple cars and he checked his cars fairly frequently. So GPS tracking wouldn't work. But on that issue we're particularly concerned because we also learned later on after the suppression hearing at trial that the same agent who applied for that Sean Wilson wiretap one, a full month before had set up a ping order on Sean Wilson where he was getting an email every 15 minutes indicating where Sean Wilson was by GPS location. And he never mentioned that anywhere in the Sean Wilson wiretap. The Maryland wiretap act requires a complete and full statement of all the other investigative methods that you've used. And for some reason that ping order was not presented. Those other issues are up here on plain error. That issue your honor. Right. So that was not before. I mean, we only learned at trial that he was receiving this email every 15 minutes. And so it wasn't really possible at the suppression hearing to sort of make that, that argument at that point. Um, and so that's right. So the, but so those are the two issues on, on necessity. That was basically a fact free necessity section. Uh, plus there was an omission of a pretty material fact, uh, from that, from that statement. Um, the other issue that, uh, that we want to raise before the court is the kind of the target subjects, the mismatched target subjects between the affidavit and the order in the Sean the affidavit. There were 17 individuals who were listed as target subjects in the order. It was just, it just came down to six, but then the 11 other were mentioned and they were called target subjects. And then the order incorporated by reference the affidavit itself. So you have a statement where the affidavit says 17, the order says six corporates by reference. The other, the affidavit were said 17. Uh, it's a bit of a sort of confusing, uh, list of, of target subjects and the Maryland. That no, Your Honor, it was, uh, that was something that's a plain error view as well. That is your, Your Honor, a plain error. The necessity argument was not plain error, but this you're right. This is plain error. And so I think on this, what we're going to say basically is that it's sort of obvious when you look at the order and the order says prejudice for plain error, the one brought is prejudice. Well, so I, so I think the prejudice here is that the admission of this, there are a couple of different things, Your Honor. First, the admission of this wiretap, uh, into this evidence, we end up making the case, but what's the prejudice from the name, the names of the targets being a little confusing. So I think there, Your Honor, I think it gets to the issue of most, mostly of minimization. If the target target, if the agents who are kind of, uh, working with the wiretap, uh, see a list that says here are six people who are target subject in this particular case, client was named in, in the wiretap, right? He was as someone who they do not have probable cause for. So they listed him on the order and then explicitly said, we do not have probable cause for him. And so there, the harm is that he's then basically looked at as a target subject. He's called the target subject, even though the court says we do not have probable cause for him. And so when an agent is sort of minimizing conversations, when minute gets on the line, he's going to minimize less, which you see clearly actually in the tickets conversation from June 5th of 2014, where they take a seven minute conversation and don't minimize that conversation at all. I also am a little unclear on the two lists, but I thought what was going on is that there's a list of people as to whom there's probable cause. And that list is allowed to include kind of a catch all and other people we don't know yet know about. And then there's another list of people. We think these may be the other people we're not yet sure about, but we're not quite ready to say probable cause, but you're still allowed to get their phone calls. You're still allowed to copy their phone calls. And it's actually sort of a pro-transparency thing to put their names down because then they get notice. So I guess I have the same question as Judge Rushing. The only, as far as I can tell, the only consequence of listing them out in that second list is that now they'll get notice. So what's the prejudice? Well, first of all, actually they didn't get notice as an inventory notice. And also it was never admitted to that, you know, post-condition issues. But what we're, in addition to sort of just listing them, they were also listed as, I'm sorry, I'll answer this. If I can answer this question. You absolutely can answer the question. They were not only were they listed as possible interceptees, they were also listed in the Wilson order as target subjects to on the order itself. They were called target subjects in the absence of probable cause. And I think you're only allowed, I mean you're required to put in people who have probable cause. You probably shouldn't be putting target subjects in into and calling them target subjects if you don't have probable cause. And if there's a confusion between whether they are or not, and I think the order itself is very confusing, would have been confusing for an agent and therefore it wouldn't have complied with the requirement that you specify clearly the target subjects on that particular wiretap. Thank you, Your Honor. Thank you very much. You've had use of reserve from time too. Mr. Standig. Yes, Your Honor. Good morning and may it please the court. My name is Zachary Stendig and I represent the United States of America in this, in this matter. So turning to the target subjects issue, the counsel was just addressing. So when you apply for a wiretap in Maryland state court there are several different documents that are part of that. There's of course an affidavit, an application, an order, a service provider order, and several other different documents. So if you look at the Sean Wilson wiretap affidavit itself, which is what the agent filled out, it says that Mr. Minnick is in fact a target subject. However, there is indeed a discrepancy with the application, which is what was signed by then state's attorney, Greg Bernstein for, for Baltimore city where Mr. Minnick is listed both as somebody who there is probable cause to believe is committing the subject offenses and somebody for whom they suspect is involved in the subject offenses, but whom, for whom probable cause has not yet developed. Now is this potentially confusing? It sure is. However, the United States Supreme Court has actually passed judgment on the very issue with regard to the inclusion or the lack thereof of a particular person in the target subjects section of a wiretap affidavit. And they did so in the Donovan case, which is 429 United States 413. And that case was from 1977. And in that case, which also discusses the substantial compliance standard with a wiretap law, which is what the government believes is the standard under which this court should analyze the compliance of with the Maryland wiretap act. And the court notes that in that particular case, two defendants were not listed as targets, target subjects, but that was not the sort of make or break error that required suppression. And that's our position here. Not to derail you from your discussion of Donovan, but you said, you just said you think substantial compliance is the standard, which is the standard under the federal wiretap law. But did you dispute in your brief that the, the defendant claims that state law governs whether these wiretaps, information from these wiretaps is admissible in federal court because these wiretaps were obtained in state court. Do you have a position on that? Yes, Your Honor. And our position is that substantial compliance is what is the standard of review that this court must apply. But do you have a position on should federal law govern whether these are admissible in federal court or should state law? Federal law should, should govern whether or not it's admissible. Is that an evidentiary issue governed by the federal rules of evidence? Yes, Your Honor. And in fact, to expand on what I believe Judge Rushing, excuse me, Judge Rushing is mentioning here, the Maryland state wiretap act says that it requires strict compliance with the act, with the, with the statute. However, that is a more stringent rule than in the, in the Maryland state courts. However, federal rule and Supreme court precedent is to govern the admission of evidence in federal courts. So our argument is that the wiretap affidavit and the materials itself must meet the substantive requirements that are, that are required under the Maryland wiretap act. However, for the admission of evidence in a federal proceeding, it is the substantial compliance standard that, that ought to, to control. And that's where the Donovan case, as well as the Chavez case, 416, United States, 562 from 1974 apply. I ask you a question and I don't, I don't, I really don't mean to unnecessarily complicate this. How do we, given that this is on plain error review, if we think that, look, there's been at least a clerical error on this thing, you shouldn't be in two places on two different lists. It is true that under plain error, you would have to show that that is prejudicial. So do we apply that standard or do we apply the substantial compliance standard? Like how do we take, how do we work those two things together? So we believe it's a plain error standard because of you, because it was not raised in the district court. And we actually also to that point would disagree with counsel that trial counsel raised the challenge to the necessity of the Wilson wiretap. Those and I'll come back to that to answer your next question, substantial compliance. Do we even get to say, I guess I'm saying do we even get to the substantial compliance standard for exclusion if we're under plain error and we think there was no prejudicial error? I don't think so judge because there's no miscarriage of justice here. I mean, it ultimately, yeah, it's a clerical error. And ultimately this case in the prosecution of Olden Minnick represents that which the courts require investigators to do when they're using this type of surveillance. I mean, there are five wiretaps at issue here. There are GPS trackers at issue here for vehicles. There are GPS trackers at issue here for, uh, for telephones as well. All of these, all of these methods of surveillance and methods of investigation were authorized by either state court judges where the, the investigation began in Baltimore city and then federal judges by chief judge Chazenow who authorized three wiretaps in this case. So to suggest that there's a miscarriage of justice in this particular case, where investigators took measured steps seeking judicial authorization over and over and over again would be, it wouldn't, it wouldn't be an unfair standard to use, especially when applying, when applying the plain standard, excuse me, the plain error standard that the government believes applies here. So circling back to what I mentioned before about the Wilson wiretap, counsel moved to suppress the Wilson wiretap in the district court. That particular motion to suppress challenges the probable cause of the affidavit that's included in the supplemental joint appendix in the counsel's reply brief. He mentions a, uh, the defendant mentions a response to the government's response to Wilson's first motion to suppress there. Uh, he, he mentions that necessity or seems to be the necessity is challenged. Uh, if you actually go to that document, if you go to the, to the defendant's response to the government's response, the motion to suppress the word necessity does not appear in that document to the extent that there is a challenge to it. Uh, counsel does mention that there was not sufficient financial background investigation. So even if you were to construe that to represent a challenge to the entire necessity for the Wilson wiretap, I think that would be, that would be probably unfair. So I think that the plan error standard ought to apply because if somebody's wanting to challenge something in the district court in order to preserve that for, um, for appeal, as, as we explained in our brief, they have to be specific about that, uh, and, and actually object on those grounds in the district court. So nevertheless, in the district court, the judge did find that in issuing his ruling on the motion to suppress the Wilson wiretap for lack of probable cause that there were, that it did satisfy the exhaustion, uh, or the necessity requirements, uh, that are, that are part of the statute. So our argument is first that plan error did not, does, is the standard here because the specific objection was not raised in the district court. And then secondly, that even if it was that judge Schwong ruled correctly, that the necessity or the exhaustion in this particular case, uh, was met. Um, and to be sure it was, um, when you, when you actually look at the Wilson wiretap itself, the whole document, um, many times during that, uh, during the affidavit, do investigators mention the difficulties they've had with their investigation? Uh, for example, uh, some of the intercepted text messages that, um, Mr. Wilson sends are in fact encoded language where he, uh, uses the last, uh, specific, uh, he combines words together in almost a pig Latin for a better way, for lack of a better way to describe it, uh, sort of way to frustrate the efforts of investigators. Additionally, they talk about counter surveillance techniques and that during the course of the investigation into Wilson in April, 2014, investigators found that he was using another cell phone different from the A line, which is the one they saw it in authorization to wiretap. And additionally, they talked about some of the ways that he was potentially changing the methods of the operation of the drug trafficking organization. Uh, he, there are phone calls where he and Brooks described, um, meetings in Los Angeles or Las Vegas. And investigators believe that that's a, an attempt to change the way that their business had been operating to frustrate, uh, law enforcement from doing this. Now, with regard to the tracking warrant that council and that council mentioned. So there's a tracking warrant section in the Wilson exhaustion or necessity portion. And that tracking section is written specifically with regard to tracking devices, the sorts of things that, uh, at the time law enforcement might have fixed to the bottom of a vehicle. And it discusses how members of the Wilson drug trafficking organization are particularly surveillance conscious. Now, to be sure the, uh, he'd provide, he had provided this, um, or he sought and been granted authorization to, uh, get the GPS location information for Wilson's phone. In any event, even the omission of that does not defeat a probable cause finding. Those things were turned over in discovery. So at this Frank's hearing should have been where this Frank's claim should have been raised in the district court level. And should that information have been included in the, uh, fire tap affidavit, it only would have bolstered the necessity finding that, that the judges could have made, or that, excuse me, that the issuing judge could have made. And that's because, as I mentioned earlier, Mr. Wilson used various phones throughout the course of the investigation. And that's spelled out throughout the affidavit and surveillance alone, but via phone location, especially when phones are going to be rotated in this manner, which is consistent with drug traffickers, as well as surveillance of vehicles will only allow for more physical surveillance. It will not provide the substance of the communications between the members of the drug trafficking organization, which is specifically what the investigators sought and what they needed to further their investigation. So our argument is first that under the plain error standard, which applies almost entirely with regard to the arguments about the Maryland State Wiretap Act, that there is no miscarriage of justice here. And secondly, that even if there is, it is preserved that there's no clear error as to Judge Schwong's finding with regard to necessity or exhaustion with regard to the Wilson Wiretap. So turning now to the, to the issue of sentence, that that counsel discussed earlier, I think it's important to point out just the very words that Judge Schwong used when sentencing and making the determination about the applicable quantity of narcotics that would be foreseeable to the defendant. And he says, quote, consider the number of sellers with whom Mr. Minnick engaged and with the large amount of cash and watches involved here, this figure may well underestimate the volume and value of the heroin sold by Mr. Minnick. I think when you look at the sentencing or the sentencing colloquy here, it would have been perfectly reasonable for Judge Schwong to have concluded that 27 kilograms of heroin at a minimum was attributable to the defendant. And that's because he was getting two to three kilograms on approximately nine occasions doing the quick math there, which I'm not good at. That could even equal as much as 27. But here we have a finding of 9.22 kilograms. And what's most important here with regard to the ultimate sentence that the  defendant was sentenced to 168 months for his involvement in the conspiracy here, which was in fact 20 months, almost two years less than the bottom of the advisory guidelines range in this case. So to say that Judge Schwong erred in this case, which we're not saying that he did, if he erred at all, it would be that he found the quantity was too low and there should have been something more in the double digits and not in the 9.22 kilogram quantity that he ultimately estimated. And that's in addition to the evidence that he considered with regard to Mr. Standbeck and to some other other folks with from whom he obtained evidence, sometimes in the quantity of four to five grams in that when he, when making that calculation, he could have used four or he could have used five grams and the district court chose to use four grams. Again, conservatively estimating what the potential of amount of drugs foreseeable to the defendant was during his participation in this drug conspiracy. Now each and every day through courts around the United States, people are circumstantial evidence is, is presented. The charge that somebody goes outside or somebody's inside and see somebody outside and they come in and they're wet and they have an umbrella is routinely given in courts throughout the United States. A defendant can be convicted on circumstantial evidence alone. There is no requirement that there be direct evidence or hard evidence as counsel. So instructed normally. Yes. And again, as, as judge King pointed out earlier, there's no objection to the jury instructions in this case. So I point that out with regard to circumstantial evidence just to show that though the defendant, it is true. There were no drugs seized from him. He's involved in drug talk on the phone. He's intercepted via the Wilson wire tap and he has a co-conspirator come in and provide non hearsay statements. Because again, statements made in furtherance of a criminal conspiracy are not hearsay under a federal rule of evidence. They're not hearsay statements. You said hearsay statements are not hearsay. I'm sorry. Statements made by co-conspirator in furtherance of the conspiracy are attributable to every conspirator and they're not hearsay. That's what the rule says. That is 801 D2E. Yes, Your Honor. Not hearsay. Correct. So there, that's not the issue here. And I, and I bring up that rule just to point out that there is significant evidence against Mr. Minnick that he participated in this drug conspiracy and that this, this quantity of heroin, heroin, which again, was underestimated by the district court is attributable to him. And ultimately he enjoyed a sentence that was below his guidelines range. And I shouldn't use the word enjoy, but he was sentenced to a sentence, to a, an amount of time that was below the bottom end of his advisory guidelines range. And he benefited ultimately, uh, from the, the judge's decision here with regard to the trial. I think it was four weeks, Your Honor. So considering the quantum of evidence in this case, considering, as I mentioned earlier, that law enforcement consistently sought and was granted authorization to conduct electronic surveillance in this case in the form of wiretaps and in the form of tracking. They argue in their brief that you all went or you all the DEA went to the state judge to dodge the review processes over in the justice department. I understand they do. Um, however, they say that they just making that up. Well, I don't think that's the case. I think that this started, and this is explained further in the Byrd affidavit. This started as a state investigation where Baltimore city police were investigating, uh, Mr. Wilson, who was believed to be a supplier of heroin in the Baltimore city area. As they continued the investigation in Baltimore, a simultaneous investigation in the Washington DC, Maryland metropolitan area revealed that Mr. Minick, the defendant was involved in drug trafficking in that area as well. So after the Brooks and Wilson wiretaps, when it became clear that there was a federal investigation in the Washington metropolitan area that was being led by the United States attorney's office and the, they went to the federal court, uh, seeking authorization from judge Chaz now for the three remaining wiretaps in this case. So unless there's any further questions from the panel, uh, we'd ask that you affirm the district court's decision. Thank you very much, sir. Thank you. We appreciate it. Mr. Webb. Thank you, Your Honor. May it please the court. Let me begin where, um, my co-counsel, my counsel, my friend, uh, just left off, uh, with regard to the drug weight. Um, every case that the district court judge cited during his sentencing hearing, uh, in every case that the government cites with regard to the mathematical calculation that was made in this case at sentencing always begins with some evidenced transaction. There's, this would be the least evidenced transaction, um, uh, at least since, uh, since this court decided Hickman in 2010. Um, the 1.25 number or the two or three number are just simply not evidenced. And there was not one shipment of it or two or three from which you could then make conservative kind of extrapolations from that. That I think is sort of at the core of the sentencing issue here. Absolutely. You can, you know, uh, sentencing judges can extrapolate from small amounts to big amounts, uh, as this court did in Gordon, for instance, that's a great example of doing that where you find two baggies of heroin in a prison cell and then the witness says, Oh, uh, I gave him that on 17 other occasions, multiply that number and you get a solid amount here. I'm, I'm concerned that there was not a single transaction from which you can then make these conservative estimations and whether you have one number of two or three and one or 1.25, just coming down from a bigger number to a smaller number isn't what Hickman requires. Hickman requires that you begin with some, something like evidence transaction, um, on the issue of, um, and just by the way, also on, on the Fred Brooks statement, we're in agreement. It's not hearsay under the federal rules of evidence. That's not a contention there, but we do believe that that required as the judge disregards said himself, that that required at least some amount of corroboration, but he has witnessed Wilson didn't testify and nobody else saw any of these shipments, uh, at all. You're saying the jury can't believe a witness unless there's corroboration. They can believe a witness. So I can believe evidence they have heard. It might be stronger and are more likely to believe it has been corroborated, but we're saying first of all, they can, they can believe it. It can, it was admitted. They can believe it. But first of all, we're talking about the sentencing, which is just the judge making his determination about without the jury. And second, okay. Well, but so, but the judge did himself say, and I think it's correct. There needs to be some corroboration of a statement that's out of court. That's not evidenced in any way, especially if you're going to sentence someone to this length of time and give a court him such a huge kind of drug weight, uh, in response to the issue of strict compliance, by the way, just getting to that for just a moment. Uh, it's, it's very clear, uh, this, this court in Bullock and in Glasgow who said that when wiretaps are obtained in Maryland state court, you would apply both the federal law and the state law. They have to be compliant with both. Uh, and Bullock says too, you would apply Maryland strict standard of strict compliance requirement under the Maryland state wiretap act. I can see why you would do that to determine, um, whether there had been sort of an underlying violation, but why on earth would you apply state law to a question of whether evidence can come into federal court? I mean, so this is a longstanding, I mean, so the Bullock in Glasgow say that squarely, uh, and they're, they, they do cite a number of other cases. The second circuit kind of developed that argument, uh, more fully. Uh, and you can see that in the citations in Glasgow and that's because the mayor, the wiretap has been authorized. Both the, the title three permits federal agents to go into a state court and to obtain wiretaps. When they do that though, they have to be in compliance with both the Maryland, the federal law and the state law. The substantive standard, you'd have to meet Maryland substantive standards because that's incorporated into the federal law. But I don't understand why when the question is not was the warrant compliant, but should this evidence come into federal court? Why on earth would we apply state law? I guess, I mean, I take it, I mean, again, I think the Bullock decision, um, and Glasgow are, are kind of. Bullock sort of hints at it. And I think Glasgow was on something slightly different question, but, um, I'm not, I'm not, I'm not, I understand your case citations. I'm not sure they're quite as controlling as you think they are, but I guess I'm just asking you as a matter of first principle, why on earth would state law govern a question of the, not the substantive compliance of the war, of the, um, wiretap orders, but whether or not evidence can be used in federal court. I mean, I think the idea is that basically the people of Maryland have decided they want to provide additional levels of privacy. But Maryland, I don't think get to decide what evidence can be used in federal court. But Congress approved our rules of evidence. Right. And Congress says that when you obtain this wiretap in state court, you apply both the Maryland, the federal law and the state law. It doesn't say you apply state law regarding exclusions, discretion, or admissibility. It says that they have to come. So, so that's my concern. I mean, those are two different things, I think. Right. I think it may also get to the contour of the Maryland state statute too, which basically says, uh, you know, any aggrieved person can apply to suppress this evidence. You're not trying to suppress it in Maryland state court. You're trying to suppress it in federal court. And that's clearly comes under 18 USC 2518 section 10 tells you if you have a, you can suppress in federal court under certain circumstances. And I don't read any of those circumstances to have anything to do with state law. I guess again, your honor. Yeah. I think, um, our kind of basic submission here is that this court has already decided this, this issue of the admissibility of wiretaps and how you construe the evidence and whether evidence can come into a federal court. Um, if you're beginning with a wiretap that's been applied for and obtained in state court and that you would apply the substantive requirements in Maryland, but you would also apply, uh, one of the substantive requirements in the Maryland wiretap act is the strict compliance. That appears in the provision of the Maryland law that governs when will evidence be excluded, right? Not one of the substantive. And just to respond, maybe, um, I guess the court's, the final position is that, so Maryland basically says, um, with any precondition, uh, any, any, anything, any precondition to obtaining this wiretap needs to be applied for and obtained, I think in strict compliance. And, and this court anyway, in these two decisions has said, uh, that means that a Maryland law applies, uh, even in federal court hearings. I understand your, your honor's concern, but we're just beginning with what this court has already said in those two cases. Mr. Webb, we appreciate your assistance. I understand you're court appointed. Yes, sir. Yes, Your Honor. We really appreciate your efforts here and your work and, uh, we couldn't make it without the appointed lawyers who come in here and help us out. Thank you very much. Thank you. We'll come down and greet counsel during court field tomorrow morning. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, Pamela A. Harris, Allison J. Rushing